Marc P. Berger
Lara S. Mehraban
Steven G. Rawlings
Kevin P. McGrath
Hane L. Kim
Jennifer K. Vakiener
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0533 (McGrath)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 19 Civ. 4025 (    ) |
| Plaintiff, | ECF Case |
| -against- | COMPLAINT AND JURY DEMAND |
| WILLIAM SCOTT LAWLER and NATALIE BANNISTER, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants William Scott Lawler ("Lawler") and Natalie Bannister ("Bannister") (collectively

"Defendants") alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      The Securities Act of 1933 (the "Securities Act") has two basic objectives: (a) to

require that investors receive financial and other significant information concerning securities

being offered for public sale; and (b) to prohibit deceit, misrepresentations, and other fraud in the

sale of securities.  The Securities Act requires companies to disclose important financial

information by registering the sale of their securities to allow investors to make informed

judgments about whether to purchase a company's securities.  When the participants in a scheme sell blocks of stock to the investing public without registering the transactions, the offer or sale of that stock can violate the registration provisions of the Securities Act.

2.      This case involves the illegal offers and sales of shares of three different microcap companies.  With respect to Broke Out, Inc. ("BRKO"), a public company, Lawler, an experienced securities lawyer, and Bannister participated in a deceptive scheme, from August 2015 through March 2016, that resulted in the unlawful, unregistered sales of millions of shares of BRKO to the investing public.  Lawler participated in a similar scheme, from February 2015 through April 2017, involving another public company, Immage Biotherapeutics Corp. ("IMMG").  Lawler also manipulatively traded the shares of a third public company, Nami Corp. ("NINK"), from December 2016 through January 2018.

3.      BRKO and IMMG were shell companies; that is, companies with no or nominal operations and at most only nominal assets or essentially cash assets.  The purpose of the BRKO and IMMG schemes was to orchestrate the transfer of control of these shell companies through the sale of these companies' stock to Lawler's client ("Client A") and individuals that Client A worked with (the "Client A Group," which includes Client A), so that the Client A Group could resell those shares to the public.

4.      In furtherance of these schemes, Lawler, among other actions, participated in the deposit of certain of those shares in brokerage accounts so that they could be resold to the public. He did so by providing false legal opinion letters to the broker-dealers, opining that the transferred shares were "freely trading" when they were not, to deceive them into accepting deposit of those shares.  In fact, those shares were "restricted" shares that could only be resold

with registration or pursuant to an available exemption, because they were under the control of the issuer and/or its affiliates.

5.     Bannister engaged in numerous acts in furtherance of the BRKO fraudulent scheme, including engaging in straw purchases of BRKO stock and depositing that stock in two brokerage accounts to help establish their eligibility for public trading; making false statements and providing fraudulent documents to a broker-dealer to convince it to accept that stock for public trading, including lying about her connections to the issuer and her true role in helping to arrange the sale of BRKO to Client A and the Client A Group; concealing that her purchase of the stock had been at the direction of, and funded by, the ultimate purchaser of the stock, and that she was not the true purchaser; engaging in fraudulent offers to sell and bids to buy BRKO shares at the direction of Lawler and Client A; engaging in matched trades of BRKO shares to disguise the return of the shares she had acquired as a straw purchaser to their true owner; and lying to a government investigator after the fact to cover up the scheme.

6.     Lawler and Bannister, with respect to BRKO, and Lawler with respect to IMMG, thus concealed from the broker-dealers that the resales were on behalf of control persons of BRKO and IMMG and that those resales required registration or compliance with applicable resale restrictions on affiliate resales.  Defendants thereby participated in the unregistered sales of securities to the investing public and in fraud.

7.     Members of the Client A Group who received purportedly "unrestricted" BRKO and IMMG shares as a direct result of the Defendants' participation in these fraudulent schemes subsequently sold those shares in concert with promotional campaigns designed to artificially inflate the price of those stocks.  Those individuals sold millions of shares of BRKO and IMMG to public investors who were deprived of the information that would have been provided in a

registration statement, including that control persons of the issuer were dumping the stock. Members of the Client A Group reaped approximately $1.3 million in illegal profits through their sales of BRKO shares before the Commission suspended trading on March 17, 2016 and approximately $1.9 million in illegal profits through their sales of IMMG shares before the Commission suspended trading on April 4, 2017.

8.      For their participation in the schemes, Lawler was paid $5,000, in addition to the tens of thousands of dollars in fees he charged in connection with his legal work for Client A, and Bannister received $10,000.

9.      Lawler also engaged in manipulative trading in a series of coordinated, matched trades in the stock of NINK to create the appearance of an active market and raise the price of NINK shares.  Lawler used his controlled account to place orders of substantially the same size, at substantially same time, and at substantially the same price as orders placed in an account in the name of a different trader.  Lawler also engaged in wash trades, selling and buying the same shares in two accounts he controlled to artificially inflate the share prices.

## **VIOLATIONS**

10.      By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Lawler, directly or indirectly, violated and is otherwise also liable for violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

11.      Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

13.     The Commission seeks a judgment permanently enjoining Defendants from future violations of the securities laws that Defendants violated, ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, and imposing civil money penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise to the alleged violations occurred in the Eastern District of New York.  For example, Lawler directed the transfer of BRKO shares by a transfer agent located in Woodmere, New York.  Separately, individuals located in Queens, New York, sent payments to a bank account under Lawler's control, which he used to fund the purchase of shares of NINK.

16.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

17.     Lawler, age 57, resides in Chandler, Arizona.  He is a licensed attorney in Arizona

and California and has practiced before the Commission.  Lawler represented BRKO, IMMG,

and NINK during the relevant periods set forth in this Complaint.

18.     Bannister, age 44, resides in Platte City, Missouri.  Her current employment status

is unknown.  Bannister has worked as an agent selling shell companies and worked with

microcap companies for at least 20 years, including serving as a compliance officer at an

offshore broker-dealer.

## ISSUERS

19.     BRKO is a Nevada corporation with its principal office address listed as a P.O.

Box in Frankfurt, Germany.  BRKO purports to be a development-stage company engaged in the

development and marketing of mobile apps.  BRKO was originally incorporated on December

19, 2014, with its principal offices in the United Kingdom.  It filed a Form S-1 registration

statement with the Commission on February 27, 2015, which was declared effective on May 8,

2015.  Its original business purpose, according to its Form S-1 filing, was "designing,

manufacturing, and selling street ware and gym fitness apparel."  On January 27, 2016, BRKO

issued 4,625,000 shares of its common stock to Digitrade Development Ltd. ("Digitrade"), a

Belize-based entity, in exchange for 100% of the issued and outstanding equity interests of

Megapps Ventures, Inc. ("Megapps"), a Nevada corporation.  Megapps purportedly held certain

phone applications as assets, which BRKO acquired to purportedly engage in that line of

business.  BRKO was a microcap company quoted on OTC Link, an inter-dealer quotation

system, operated by OTC Market Group, Inc. ("OTC Link").[1]  The Commission suspended BRKO from trading on March 17, 2016 because of concerns regarding the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in BRKO's stock.

20.     IMMG is a Nevada corporation with its principal executive offices in Bethesda, Maryland.  According to its Form 10-Q, filed with the Commission on January 6, 2017, IMMG was a biotechnology company that was developing cancer immunotherapy in connection with a patent application that was filed by PepVax, Inc.  IMMG's predecessor entity, Epicure Charcoal Inc. ("EPCC"), filed a Form S-1 registration statement with the Commission on December 10, 2012, which was declared effective on July 31, 2013.  EPCC described itself as a development-stage company that intended to sell its own brand of charcoal products for barbeque and restaurant purposes.  IMMG was a voluntary filer of periodic reports with the Commission. IMMG was a microcap company quoted on OTC Link.  The Commission suspended IMMG from trading on April 4, 2017 because of concerns regarding the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in IMMG's stock.

21.     NINK is a Nevada corporation with its principal executive offices in Kuala Lumpur, Malaysia.  NINK was originally incorporated in Nevada under the name Pack Fuerte, Inc.  It filed a Form S-1 registration statement with the Commission on March 1, 2013, which was declared effective on October 4, 2013.  On November 3, 2016, Pack Fuerte, Inc. merged with its wholly-owned subsidiary, NAMI Corp, with NINK as the surviving entity.  NINK purported to be a developmental-stage company that intended to develop a built-in safe with a

---

[1] A microcap company is a company with low or "micro" capitalizations—the total value of the company's stock is generally less than $300 million.

combination lock that can store personal and/or valuable items inside of backpacks, carry-on luggage and suitcases.  Following a reverse merger on July 12, 2018, NINK is now purportedly involved in aluminum-ore financing and trading, as well as mining and exploration of properties located in Malaysia.  NINK is a microcap company currently quoted on OTC Link.

## FACTS

**A.      Background Concerning Registration Requirements**

22.      Under Section 5 of the Securities Act, a company (an "issuer") or any other person selling stock may only do so if it: (1) registers the transaction pursuant to a valid registration statement that applies to that specific offering of stock; or (2) sells the stock in a transaction that is exempt from the registration requirements of Section 5.  Registration is transaction specific and each offering must be registered or exempt from registration.

23.      To register an offer or sale of securities, a company is required to file a "registration statement."  A registration statement is a disclosure document filed with the Commission and available to the public that registers specific offerings of securities and provides important information about an issuer's business operations, financial condition, results of operation, risk factors, and management to potential investors before they purchase.  It also should disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

24.      Section 5 applies to both an issuer and its "affiliates," who are generally defined to be persons that the issuer controls, that control the issuer, or that are under common control with the issuer.  Rule 405 defines "control" (including the terms "controlling," "controlled by," and "under common control with") to mean the possession, direct or indirect, of the power to direct or cause the direction of management and the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

25.     Typically, affiliates include officers, directors, and controlling shareholders but any person who is "under common control" with an issuer may also be an affiliate.

26.     Section 5 and its exemptions from registration are designed to distinguish between securities offerings by issuers (which require registration), and trading in the market once securities have come to rest in the hands of investors.

27.     Section 4(a)(1), for example, exempts "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  As relevant here, an underwriter is defined to include any person who has either purchased from "an issuer with a view to the distribution" of any security, or who "offers or sells for an issuer" in connection with the distribution of any security.  For the purpose of the definition of an underwriter, an "issuer" is additionally defined to include affiliates, i.e., "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

28.     Affiliates may resell their securities to the public pursuant to a registration statement filed by the issuer.  Absent registration, affiliates may only resell their stock pursuant to the fairly stringent terms required by Rule 144 of the Exchange Act [17 C.F.R. 230.144] which, among other things, imposes holding period requirements and limits the amount of stock that can be sold by affiliates.  This regime ensures that insiders and affiliates of a company cannot dump their stock into an uninformed market.

29.     To prevent an issuer and its affiliates from circumventing the registration requirements, stock acquired by affiliates from the issuer or another affiliate is "restricted," meaning that it cannot be resold in the marketplace unless the sale is registered or the sale is exempt from registration requirements.  To evidence this, the stock certificate usually carries a

restrictive legend that prohibits the stock from being resold to the public unless and until the

registration requirements of Section 5 are met or the sale is otherwise exempt.

30.     "Unrestricted stock" generally refers to stock that does not have a restrictive

legend, which is one indication that it may be offered and sold in the public marketplace by a

non-affiliate, without registration or restriction.  However, registration statements are transaction

specific.  Registration does not attach to the security itself and registration at one stage for one

party does not necessarily suffice to register subsequent offers and sales by the same or different

parties.  If the stock is owned by an affiliate of the issuer, the stock is restricted in his hands

irrespective of whether the stock was previously offered in a registered transaction.  For this

reason, characterizing a stock as "freely trading" to suggest that it can be traded at any time

thereafter without registration is misleading and incorrect and the terms "free trading" or "freely

trading" stock are not terms used in either the Securities Act or the Exchange Act.

31.     "Penny" or "microcap" stocks are securities issued by small, publicly traded

companies that typically trade at less than $5 per share, and often at less than $1 per share.

Penny stocks typically are not listed on organized securities exchanges such as the New York

Stock Exchange or the NASDAQ Stock Market, but rather are traded on over-the-counter

markets, like OTC Link.  OTC Link is an inter-dealer quotation and reporting service through

which certain stocks are available for trading and are publicly purchased and sold through

brokered orders.

32.     Penny or microcap stocks are particularly susceptible to manipulative trading and

other forms of fraud because, among other things, they are often thinly traded.  Consequently,

their shares may be controlled by a single individual or group of individuals (often called a

"control group").  Such a control group often places certain shares in the names of third party

"nominee" or "straw" shareholders (who do not actually own or control those shares), to disguise the control group's ownership and control over those shares.

**B.     Background to the Scheme**

33.     Individuals who intend to engage in promotional campaigns to artificially inflate company stock and then take advantage of the inflated prices to unload their shares to the unsuspecting public often purchase public shell companies to effectuate their scheme.  Shares of public shell companies are already eligible to be traded publicly, but the companies have no or nominal operations and at most only nominal assets or cash assets.  As a result, those interested in acquiring public shell companies can do so relatively cheaply.

34.     They will often buy a public shell company that has already issued ostensibly "unrestricted shares," then merge a private company into the public shell company (or otherwise exchange shares between the private and public company) and then use false or misleading claims about the alleged business of the new company to inflate the price of the publicly trading shares.  This is what happened in this case—twice.

35.     It was important to the Client A Group to have control of 100% of the acquired companies' shares, or as close to 100% as possible, to conduct an effective promotional campaign because, otherwise, independent shareholders could unexpectedly sell their shares as the share price was rising, creating a downward pressure on the share price and thereby decreasing the profits that could be reaped by the control group.

36.     It was also important to the Client A Group that the acquired stock in those companies be characterized as "unrestricted" shares that were immediately tradeable, so that they had certainty that they could sell their shares at a time of their choosing in coordination with the promotional campaigns.

37.     FINRA must provide clearance for broker-dealers to publish stock price quotations on OTC Link.  In this case, once FINRA provided the clearance, BRKO and IMMG sought to obtain Depository Trust Company ("DTC") eligibility so that trades of their stock could be settled electronically and thereby be traded to the public.  In order to maintain DTC eligibility, stock must be deposited at a broker-dealer.  Broker-dealers accepting deposits conduct due diligence, such as investigating whether shares are being deposited by control persons or affiliates of the company, to satisfy their gatekeeping responsibility.  The Client A Group explicitly wanted assurances that the shares would be considered "unrestricted" by gatekeepers such as broker-dealers and transfer agents before finalizing its purchase of BRKO and IMMG.

38.     Defendants participated in a fraudulent scheme that enabled the Client A Group to acquire 100% of the shares of public shell companies, including shares that Lawler represented were "unrestricted" and "freely tradeable," that members of the Client A Group then resold to the public in violation of the registration requirements of Section 5, contemporaneously with promotional campaigns that artificially inflated those shares prices.  Lawler helped the Client A Group in nearly every step of the scheme, including helping them acquire control of all of the companies' shares, and by misrepresenting those shares as both unrestricted and in the hands of non-affiliates, thereby concealing from gatekeeper broker-dealers and transfer agents, and, most notably, public investors, that company insiders controlled the stock being resold.  Bannister, as an agent for the sale of BRKO to the Client A Group, assisted in the BRKO scheme by also hiding the true nature of the scheme from gatekeeper broker-dealers and by posting sham bids and offers for BRKO shares at Lawler's direction.

39.     The broker-dealers were thus deceived into accepting BRKO and IMMG shares for trading, which thereby assured the Client A Group that their plan to engage in promotional

schemes in these companies' stocks could go forward.

40.     BRKO and IMMG were subsequently subject to promotional campaigns, resulting in profits to accounts associated with the Client A Group of $3.2 million through the sale of shares to the investing public that should have been restricted.

41.     Lawler and Bannister, through their statements and actions, were necessary participants in the unlawful sale of these BRKO and IMMG securities to the investing public.

**C.     IMMG**

**1.     Formation of EPCC and S-1 Issuance of Shares**

42.     IMMG began as EPCC, which was incorporated in Nevada on June 21, 2012 as a charcoal company.  Its filings identified its founder and sole officer and director ("Founder A").

43.     EPCC issued restricted stock to Founder A on or about September 30, 2012.  On December 10, 2012, EPCC filed a Form S-1 registration statement with the Commission, seeking to register the public sale of certain of its stock.  Form S-1 is an initial registration form for the public offer and sale of securities by companies and is used when no other form is authorized or prescribed.  (Form S-1, General instructions (17 CFR 239.11).)  The EPCC Form S-1 registration went into effect on July 31, 2013, after three amendments.  EPCC stated in the Form S-1 that it was a shell company: it "has not yet implemented its business model and to date has generated no revenues."

44.     On August 8, 2013, a South African national was appointed as Secretary of the Corporation (the "SA Secretary") pursuant to a board resolution purportedly signed by Founder A.  However, Founder A had no knowledge of this resolution, was unaware that this South African individual was appointed Secretary of EPCC, and knew nothing about him.

45.     In and around August and September 2013, EPCC sold shares pursuant to the Form S-1 registration statement to 38 individuals, all based in South Africa and reported by

EPCC to be friends or family of the SA Secretary or co-workers of his mother (the "named S-1 Shareholders").

46.     These individuals were not bona fide purchasers.  They either were unaware that shares had been purportedly "sold" to them or were straw purchasers of shares that were always under the control of the issuer or its affiliates.

47.     For example, the majority of the South African investors purportedly paid for their shares using payment methods that could not be traced to their names.  Payments from 20 investors were evidenced by only a deposit slip or a deposit receipt for ABSA bank, listing the SA Secretary's name, and reflecting that the deposits were made in cash.  All deposits were made on August 27, 28, or 30, 2013.  Payments from 14 other investors were evidenced by cashiers' checks with sequential numbers from ABSA bank, all dated August 24, 2013, indicating they were all purchased at the same time.

48.     In many instances, multiple members of an individual family reportedly living at the same address purportedly purchased shares of EPCC.

49.     One of the named S-1 Shareholders ("Investor 1") was approached by the SA Secretary, a high school friend, who asked him to sign paperwork for an investment in EPCC. The SA Secretary told Investor 1 that money would be paid for the supposed investment and that Investor 1 was not required to make any payment himself.  Investor 1 never personally paid anything.  The SA Secretary asked Investor 1 to sign a document (that Investor 1 denies having read), and Investor 1 never received any additional information on the supposed investment.

50.     Investor 1 never received any shares, sold any shares, or received proceeds from the sale of any shares of EPCC.  The address on the stock purchase agreement was not Investor 1's.

51.     Another of the named S-1 Shareholders ("Investor 2") was not aware that she had ever invested in a company called EPCC or in any charcoal company.  Although she knew the SA Secretary, he never asked her to invest in a company or sign papers.

52.     Founder A had no knowledge that any EPCC shares were sold to anyone in South Africa or elsewhere and, to his knowledge, EPCC did not receive proceeds from any sales of EPCC shares, even though he was the company's sole senior officer and director at that time and had control, to his knowledge, of the company's sole bank account, located in the U.S.  On October 3, 2013, someone using an email address in the name of Founder A—an address Founder A denies ever using or being aware of—directed the transfer agent to send "all Share certificates to" the SA Secretary in South Africa.  The shares purportedly issued under the Form S-1 were issued in the names of the 38 shareholders on October 4, 2013 and the transfer agent mailed the certificates on October 7, 2013, along with the certificate for Founder A's shares, to the SA Secretary in South Africa.[2]

### 2.     Lawler Assists the Client A Group in Acquiring All EPCC Shares

53.     As early as September 2014, an individual began to offer EPCC for sale, emailing another person: "Here are 2 shells you are looking for.  EPCC delivers 100% but not DTC . . . ."  The phrase "EPCC delivers 100%" meant that the person behind the sale of EPCC was

---

[2] Irrespective of whether the named S-1 shareholders were bona fide purchasers at the time of the S-1, the issuer and its affiliates, as set forth below, exercised dominion and control over those shares at the time they negotiated the sale of the company to the Client A Group.  They were able to negotiate and deliver 100% of the outstanding shares upon sale, including those of the purported S-1 Shareholders.  Thus, given that registration is transaction-specific, even if the purported sales to the named S-1 Shareholders were bona fide and legitimately registered, at the time the Client A Group negotiated and received their shares, they were acquiring them from the issuer or an affiliate of the issuer and thus the transaction should have been registered.  And because the Client A Group obtained 100% control, they thereby became affiliates and could not resell their securities as unrestricted.

representing that he could deliver 100% of all EPCC shares to the buyer, including the shares

purportedly owned by the named S-1 Shareholders.  The reference to "not DTC" indicated that

the shares had not yet been confirmed by the DTC as eligible for deposit.

54.      In and around February 18 and 19, 2015, an individual associated with a company

that engaged in selling shell companies ("Shell Agent employee") engaged in email

communications with Client A regarding the potential sale of several public shell companies to

Client A, including EPCC.

55.      Client A retained Lawler in connection with Client A's efforts to acquire control

of all the shares of EPCC.  An engagement letter specified that Lawler's firm was being retained

by Client A to, among other matters, "represent you to acquire all of the available securities in

[EPCC]."  Lawler was also copied on an email chain in which Client A told the Shell Agent

employee that he "and his team" were interested in acquiring EPCC as one of four publicly

traded shell companies they wanted to acquire.

56.      A term sheet dated February 17, 2015 that Client A signed summarized the

proposed deal.  It provided, in part, that Client A's company "and/or its Assigns" agree to

purchase "100,202,466 issued and outstanding shares of EPCC" for $330,000.  It further made

clear that the deal was to include the sale of both the "restricted shares" and the "free trading"

(i.e. "unrestricted") shares of EPCC.  The term sheet also required the "resignation of certain

EPCC's officers and directors, and the appointment of PURCHASER'S designee(s) as officers

and directors of EPCC" before the purchase price would be released from escrow.

57.      At least one draft escrow agreement, dated February 26, 2015 but unexecuted,

stated that Client A's company was the "representative of certain investors" acquiring

100,202,466 shares of EPCC.  A draft stock purchase agreement for one of the supposed

purchasers, dated March 2015, also unexecuted, stated that Client A's company was "serving as a representative of the purchaser."

58.     Client A copied Lawler on a communication with the Shell Agent employee in which Client A wanted confirmation concerning EPCC that: "1. this is a shell company 2. you are delivering 100% of restricted and free trading shares 3.  This is DTC approved company with market makers already."  The Shell Agent employee responded: "All is correct…"

59.      By April 2015, an individual associated with Client A was put into place as EPCC's President and board member, and that individual appointed Lawler as the Corporate Secretary, enabling Lawler to direct share transfers.

60.     By mid-2015, Client A obtained control of a non-public biotechnology company that he sought to merge with EPCC.

### 3.     Lawler Participates in Fraudulent Sale of EPCC Stock to Facilitate Sale of EPCC

61.     On April 6, 2015, the Shell Agent employee sent Lawler an email stating, in part, "DTC application came through March 13 so is good until at least April 13 must deposit now!!" On April 7, 2015, Lawler sent Client A an email stating, in part, that: "In order to maintain the DTC status, I am sending to the transfer agent the smallest share certificate that we have (3,441 pre-split shares) to have them transferred to [Shell Agent] so they can deposit them ASAP."

62.     There is no evidence that Lawler communicated directly or otherwise with the named S-1 Shareholder of the 3,441 shares before he committed to arranging for the transfer of those shares to the Shell Agent employee, indicating Lawler's belief that the named S-1 Shareholder's shares could be directed in this fashion.

63.     Client A responded to the April 7, 2015 email, stating: "Thanks Scott [Lawler], we absolutely cannot close unless the shares can be deposited and DTC eligibility confirmed.

Will [Shell Agent] then transfer the shares back to the shareholder who paid for it?"

64.     Lawler responded: "Yes they will.  I may have to do some more stock purchase agreements to paper this."

65.     One day later, on April 8, 2015, Lawler emailed Client A with confirmation of DTC eligibility for EPCC.  Lawler also informed Client A that he had been in touch with individuals at the Shell Agent and that they were "providing assistance in getting some stock into the system to assure that EPCC maintains its DTC eligibility."  Lawler assured Client A that another of the Shell Agent's employees was "extremely well-versed in DTC issues and has a very good and close contact at DTC."

66.     Lawler further advised Client A that this Shell Agent employee expected to receive the EPCC shares issued in his name by Friday, that he expected to have the shares deposited and cleared for trading at a broker-dealer by the following Thursday, April 16, that they still had until April 27 to get the shares deposited to maintain DTC eligibility, and that this Shell Agent employee had assured Lawler "that he can get the stock deposited and cleared after the 45 day period without losing DTC eligibility."  Lawler further reassured Client A that in his experience with the Shell Agent: "when it comes to trading and DTC issues, they always have the correct information and the correct solution."

67.     Lawler added that he had received all of the other required documents, including the stock purchase agreement for the control block of EPCC shares, and that Client A's representative had been appointed the new sole officer and director of EPCC.  Lawler concluded: "Therefore, I would recommend that we proceed with the closing.  Please advise."

68.     Despite these strong assurances from Lawler and the Shell Agent employee, Client A refused to go forward with the deal until he received confirmation that EPCC shares had

been deposited with a broker-dealer and DTC eligibility was confirmed.  He stated in an email on April 8, 2015, to Lawler and the Shell Agent employee: "Absolutely not.  We cannot close until the shares are deposited, and DTC eligibility is confirmed.  I apologize but I simply cannot cut corners when it comes to things like these, and neither should the seller be permitted to, regardless of the 'certainty' of the task.  As our lawyer, I am taken aback that you would recommend otherwise."

69.     Client A's adamant refusal to close on the deal until he had confirmed that shares of EPCC had been accepted for deposit with a broker-dealer and were eligible for immediate trading was a clear indication that Client A wanted to ensure that shares being acquired from the named S-1 Shareholders were immediately eligible for resale to the public.

70.     Further, the fact that Client A was so focused on the fate of these shares, which were ostensibly to be purchased by the "Purported Purchasers" discussed below, was a clear indication that the Purported Purchasers were not acting independently of Client A but rather were acting as part of a control group with Client A (i.e., the Client A Group), thereby making them all affiliates of EPCC, given that Client A's company was acquiring the controlling interest in EPCC.  As such, in their hands, the shares were restricted control shares and any subsequent resale to the public would require registration or some other exemption from registration.

71.     Given Client A's refusal to close on the deal until shares were deposited and DTC eligibility was confirmed, on or around April 10, 2015, Lawler sent the transfer agent instructions to transfer approximately 905,211 EPCC shares[3] to an entity acting at the direction of the Shell Agent ("Entity A") to deposit in its account at a broker-dealer ("Broker 1").

---

[3] Because of a forward stock split, 3,316 original shares of EPCC were converted into 905,211 shares.

72.     On April 10, 2015, Entity A submitted to Broker 1 a fraudulent stock purchase agreement purporting to be between Entity A and the named S-1 Shareholder who was listed as owning the 3,316 shares, but whose shares were under sufficient control of the issuer that Lawler could assure Client A that those shares would be transferred and deposited to maintain DTC eligibility.  The agreement specified a purchase price of $1,000 for the shares, was backdated to December 22, 2014, and stated that the closing on the transaction would occur on or before December 22, 2014.  No such sale had taken place between the named S-1 Shareholder and Entity A on or before December 22, 2014.

73.     Broker 1 responded that it could not rely on the information in its file to proceed with the sale of these shares.  It explained: "Because the issuer is a shell company, and because the previous holder was not a US resident, we believe that [we] should require the customer to provide a legal opinion upon which [it] can reasonably rely concluding that neither the previous holder nor the customer is an affiliate of the issuer and that these are non-restricted shares that [it] can sell in broker's transactions under Section 4(a)(4) of the Securities Act of 1933."

74.     On April 13, 2015, the Shell Agent employee emailed Lawler a copy of the fraudulent stock purchase agreement between Entity A and the named S-1 Shareholder.  The Shell Agent employee also emailed Lawler a stock certificate dated April 10, 2015 issued in the name of Entity A for 905,211 shares of EPCC.

**4.     Lawler Submits Fraudulent Legal Opinion Letter to Broker-Dealer to Facilitate EPCC Sale**

75.     On April 13, 2015, the Shell Agent employee told Lawler that he might need the stock-purchase agreement for the opinion that Lawler was going to submit to the broker for the deposit of the shares.  The Shell Agent employee stated, in part, "Please write a legal opinion and

shoot it over to [the broker-dealer]. . . . it just needs to state that the shares are free trading and I am not an affiliate."

76.     On April 22, 2015, despite knowing that the stock purchase agreement submitted to Broker 1 was fraudulent, Lawler provided a legal opinion letter stating that Entity A purchased the shares in a private transaction and entered into the stock purchase agreement in December 2014.  This was false because, as Lawler knew:

(a)     The stock purchase could not have occurred on or before December 22, 2014, as the idea that the Shell Agent would arrange for the deposit of 3,316 shares with a broker-dealer to maintain DTC eligibility did not arise until Lawler suggested it in his April 7, 2015 email to Client A;

(b)     The stock purchase was not bona fide because Client A expected the shares to be sold as part of the sale of 100% of EPCC's shares to the Client A Group and thus Entity A was at best a straw purchaser for the Client A Group;

(c)     Entity A, the company ostensibly buying the shares for $1,000, did not in fact pay for them as represented in the stock purchase agreement.  (In fact, as set forth below at paragraph 97, Entity A subsequently conveyed these shares to one of the Purported Purchasers); and

(d)     Lawler had already received into his law firm trust account funds for the purchase of these shares by one of the Purported Purchasers, along with a draft stock purchase agreement between the Purported Purchaser and the named S-1 Shareholder in whose name these shares were held.  (Indeed, in

November 2015, the shares were transferred from Entity A to that

Purported Purchaser without any payment.)

77.     Lawler also stated in his opinion letter that "no circumstantial evidence has risen to otherwise invalidate the unrestricted nature of the Shares which are freely tradable [sic] as registered securities."  This omitted facts known to Lawler that would be material to Broker 1's decision whether to accept the shares for deposit, namely that the sale was not a bone fide sale; that Lawler himself had directed the transfer of the shares held in the name of the named S-1 Shareholder to Entity A on behalf of Client A; that the company that purported to purchase the shares was acting on behalf of the Shell Agent that was helping sell 100% control of EPCC and its shares to the Client A Group; and that Lawler, who was coordinating Entity A's actions but was not its lawyer, was actually acting on behalf of the Client A Group.

78.     Broker-dealers seek such attorney-opinion letters, among other reasons, to meet their statutory gatekeeping obligation to ensure that the customer seeking to deposit and sell shares is not acting as an underwriter and is not an affiliate of the issuer.  The facts omitted by Lawler were important for such a broker-dealer to know as they speak to whether Entity A could have been considered an underwriter or an affiliate.

79.     In addition, Lawler's legal opinion that the shares were "freely tradeable" was based, in part, on the false appearance that the named S-1 Shareholders had independently and legitimately purchased their shares pursuant to the S-1 registration statement.  However, Lawler knew, but did not disclose to the broker-dealer, that all of the named S-1 Shareholders were selling all of their shares as part of a single transaction orchestrated by the issuer and/or its affiliates who were selling control of EPCC and all of its shares to the Client A Group.  This was a significant indication that the named S-1 Shareholders' stock was in fact controlled by the

issuer and/or its affiliates, such that their shares would not be "unrestricted" upon transfer to the Client A Group.  Any purchaser of this stock would be acquiring it from the issuer and/or its affiliates, and if the purchasing group acquired all of the stock of the company, that stock would be control stock.  Lawler failed to disclose this material fact to the broker-dealer and frustrated its efforts to conduct its necessary due diligence.

80.     Client A gave Lawler the names of the ten individuals from China who were purportedly buying the precise number of shares held by the named S-1 Shareholders (the "Purported Purchasers").  It was suspicious, at the least, and unlikely, that ten Chinese individuals, ostensibly acting entirely independently of Lawler's client, would be willing to pay for shares of a Washington-based start-up charcoal shell company and were willing to do so in amounts that precisely matched the amounts held by the named S-1 Shareholders.  This unlikely scenario, combined with the fact that all ten Purported Purchasers were in fact acting in concert with Client A, who wanted to acquire the restricted shares of EPCC and was insistent that the shares being purchased by the Purported Purchasers be accepted as unrestricted by broker-dealers and eligible for immediate trading to the public, was a clear indication to Lawler that the Purported Purchasers were in or under the control of the Client A Group, which was acquiring control of EPCC.  These facts meant that the shares that were being purchased were restricted as they were under the control of the issuer or its control persons.

81.     Accordingly, Lawler's legal opinion that the shares were "freely tradeable" was intentionally or recklessly fraudulent and misleading, given his knowledge of and failure to disclose material facts known to him that contradicted his opinion and his omission of important legal considerations.

82.     After receiving Lawler's opinion letter, Broker 1 accepted the shares submitted by Entity A for deposit on April 29, 2015.  This provided the assurance that Client A required, as a condition of going forward with the sale, that the shares in the names of the named S-1 Shareholders would be accepted for deposit as unrestricted shares and thereby permitted by broker-dealers to be traded to the public in unregistered transactions.

**5.     Lawler Participates in Sale of EPCC Shares to the Client A Group**

83.     The sale of the EPCC shares to the Client A Group occurred on or around May 12, 2015.  Lawler thereafter paid the Shell Agent $15,000 for its services out of funds Client A provided.  In connection with the purported sale of the EPCC shares, 37 of the 38 named S-1 Shareholders purportedly signed "Irrevocable Stock Power" agreements, agreeing to "irrevocably constitute and appoint" the transfer agent to transfer the shares, and "Third Party Release" forms to transfer their shares.

84.     Irrevocable Stock Powers and Third Party Release forms are used to transfer ownership of shares, in lieu of signing the back of stock certificates.  Where the buyer of the shares was to be listed, however, the forms were blank.  Moreover, the fact that the named S-1 Shareholders did not simply sign the back of their share certificates indicates that they did not possess or control them.

85.     These 37 named S-1 Shareholders purportedly signed these documents in front of the same notary in the town of Bloemfontein, South Africa.  But for at least 16 of them, their addresses (as provided to the transfer agent) were in Northern Cape, South Africa.  Northern Cape, South Africa is more than 250 miles from Bloemfontein, South Africa.  These facts make it highly improbable that the 37 named S-1 Shareholders in fact all signed these forms.

86.     These facts further indicate that the named S-1 Shareholders did not have control over the stock certificates when those shares were purportedly transferred to the Client A Group,

and that the shares attributed to them never left the control of the company, or the person(s) who controlled the company, who were selling the shares to the Client A Group.

87.     The remaining named S-1 Shareholder was the person whose shares were initially "sold" to Entity A at Lawler's direction.

88.     From March 19 to March 26, 2015, Lawler's attorney-trust account received incoming wires from the ten Purported Purchasers, ranging from $13,906.42 to $16,912.74, all wired from banks in China.  Those investors were purportedly sold a total of 40,142,136 shares (including the 905,211 shares that were initially "purchased" by Entity A) at approximately $0.0037 per share.

89.     On or about April 17, 2015, Lawler was appointed Corporate Secretary of EPCC and designated sole signer for a new bank account for EPCC.

90.     On or about May 11, 2015, Lawler sent a single set of instructions to the transfer agent advising it to transfer the 60,058,909 restricted shares of EPCC to Client A's company, and transfer the 39,236,925 shares purportedly held by 37 of the named S-1 Shareholders to the names of the ten Purported Purchasers.  Paperwork for the sale had been completed in March 2015 and the shares were sold in early April 2015, but there was a delay in transferring both the restricted and the purportedly unrestricted S-1 shares because of a problem regarding the restricted share certificate for Founder A's shares.  On May 7, 2015, Lawler emailed the transfer agent stating, "We have a deal that we tried to close yesterday but need to resolve this first. . . . I've got many anxious people waiting for me to close this deal."

91.     Once the deal closed, Lawler did not transfer any of the sales proceeds received into his trust account from the Purported Purchasers to the named S-1 Shareholders.  Lawler's trust account records show no payments to the named S-1 Shareholders and do not show any

debits matching the amounts that the Purported Purchasers allegedly paid for the shares going to anyone else.

92.     Instead, one lump sum payment in the amount of $83,178.37 for all of the shares ostensibly sold by the named S-1 Shareholders was wired from Lawler's attorney-trust account to a bank account for an offshore trust company located in Bangkok, Thailand, even though the named S-1 Shareholders were located in South Africa.  This was another clear indication that the named S-1 Shareholders were not bona fide shareholders but rather were either acting under the control of the issuer or unwitting shareholders in name only of shares that never left the control of the issuer.

93.     Indeed, Investor 1 never received any proceeds for the sales of the EPCC issued in his name (and, indeed, never paid any proceeds or owned any EPCC shares).  And Investor 2, as noted above, did not knowingly invest in EPCC.

94.     On April 1, 2015, a Stock Purchase Agreement containing a signature for Founder A purported to document his agreement to sell his 5,000,000 restricted shares of EPCC to Client A's company for $180,000.  Founder A never saw nor signed any such agreement, never heard of Client A's company, never received $180,000 for the sale of his shares to Client A's company, and was "shocked" when he was first shown this agreement by Commission staff.

95.     Founder A stated that he did subsequently receive $15,000, which an EPCC business associate told him was for the sale of the company, but Founder A had no knowledge or involvement in any of the details of that sale and had no knowledge that his shares were sold to Client A's company.

96.     Lawler subsequently instructed the transfer agent to transfer all of the restricted shares to Client A's company, and to transfer the remaining purportedly unrestricted shares from

the names of the S-1 Shareholders to the names of the ten Purported Purchasers.  Lawler asked

that the stock certificates in the names of these Purported Purchasers be sent to him.

97.     The shares that had ostensibly been sold to Entity A were withdrawn from deposit

on or around October 21, 2015, and on or around November 20, 2015, transferred to one of the

ten Purported Purchasers, who had paid for them in March 2015.

98.     On May 21, 2015, Client A caused EPCC and IMMG, at that time a wholly-

owned subsidiary of EPCC, to merge, with IMMG as the surviving entity.  EPCC filed an Article

of Merger with the Nevada Secretary of State, "whereby it entered into a merger with its wholly-

owned subsidiary [IMMG]."  IMMG was described as "a biotechnology company developing

cancer immunotherapy through the rapid and efficient development of cutting edge

immunotherapy candidates using bioinformatics and outsourced laboratory resources."  IMMG

listed its address as that of Lawler's law firm in reporting the name change to FINRA.

99.     On June 29, 2015, Lawler sent the transfer agent the shares certificates for the ten

Purported Purchasers and for Client A's company and asked it to reissue the EPCC shares in

IMMG's name.  Lawler wrote to the transfer agent, "These shares have never been delivered to

the shareholders.  Please have the certificates delivered back to our office via overnight

delivery."

100.     Lawler knew that if the Purported Purchasers were acting under the control of

Client A and/or his company, who now controlled IMMG, the shares that they acquired from the

named S-1 shareholders would not be unrestricted shares eligible for sale to the public.  Indeed,

Lawler claims to have told Client A that each Purported Purchaser had to be acting

independently of Client A and his company, and acting independently of each other, for the

shares to be unrestricted, evidencing his knowledge of the relevant securities laws.

101.    Lawler also claimed that he had put warranties in the stock purchase agreements he drafted whereby the Purported Purchasers warranted that they were "acquiring the Shares as principal for the Purchaser's own account, for investment purposes only, and no other person has a direct or indirect beneficial interest in the purchased shares."

102.    However, the stock purchase agreements that Lawler prepared were in English and he took no steps to confirm directly that the ten Purported Purchasers, all Chinese nationals, understood English or understood and agreed to the warranties contained in the English language agreements they allegedly signed.

103.    Lawler has admitted that he did not communicate directly with any of the Purported Purchasers in connection with any aspect of the sale of EPCC/IMMG shares to or by them; rather, all of his communications regarding their shares were made through Client A.  In all relevant negotiations, Lawler communicated solely with Client A.

**6.    Lawler Assists Two Purported Purchasers in Depositing IMMG Shares with U.S. Brokers**

104.    In August 2015, Lawler assisted two of the Purported Purchasers, Wensheng Lin ("Lin") and Sheng Li ("Chen"), in depositing their shares with U.S. broker-dealers.  Shares in the names of these two individuals were sold during the promotional campaign described below.

105.    Lawler sent a letter dated August 4, 2015 to a registered representative at Broker 2 stating that he had acted "as the escrow agent on behalf of the Sellers" in connection with Lin's purchase of the shares.  Broker 2 accepted Lin's deposit of IMMG shares on or around August 20, 2015.

**7.    Lawler Submits Fraudulent Legal Opinion Letter to Broker on Behalf of Purported Purchaser**

106.    On or around September 1, 2015, Chen sought to deposit her shares with Broker 3.  Broker 3 asked Chen to provide an attorney-opinion letter.  Even though Lawler has

admitted that he had never communicated with any of the Purported Purchasers, Lawler sent a letter dated August 31, 2015 stating he was "of the opinion that the stock transactions by which the Stock was issued to [Chen] was validly registered pursuant to the Securities Act of 1933." Specifically, Lawler stated: "The Holder acquired the Stock from four (4) previous holders . . . , each of whom purchased the Stock directly from the Issuer on or about August 24, 2013, pursuant to an effective Registration Statement filed by the Issuer on Form S-1/A, file number 333-185368, effective date August 1, 2013.  Neither the Holder or [sic] the previous holders are or have been affiliates of the Issuer within the last ninety (90) days."[4]  Lawler concluded, based on these facts and that "the Holder resides in China," that, "I am of the opinion that the Holder is able to freely sell the Stock."  On September 14, 2015, Chen's deposit of 3,897,621 shares of IMMG was approved by Broker 3.

107.    Lawler's legal opinion that the shares were "freely tradeable" was based, in part, on the false appearance that the named S-1 Shareholders had independently and legitimately purchased their shares pursuant to the S-1 registration statement.  However, Lawler knew, but did not disclose to the broker-dealer, that all of the named S-1 Shareholders were selling all of their shares as part of a single transaction orchestrated by the issuer and/or its affiliates who were selling control of the company and all of its shares to the Client A Group.  This was a significant indication that the named S-1 Shareholders' stock was in fact controlled by the issuer and/or its affiliates, such that their shares would not be "unrestricted" upon transfer to the Client A Group.  Any purchaser of this stock would be acquiring it from the issuer and/or its affiliates, and if the purchasing group acquired all of the stock of the company, that stock would be control stock.

---

[4] The effective date of the S-1 registration statement was actually July 31, 2013; Lawler appears to have made an error.

Lawler failed to disclose this material fact to the broker-dealer and frustrated its efforts to conduct its necessary due diligence.

108.     At the time he submitted the legal opinion letter to Broker 3, Lawler also knew, or was reckless in not knowing, that Chen was not a bona fide purchaser of the shares and that the shares therefore were not freely tradeable.  Specifically, Lawler knew that the Client A Group had sought to purchase 100% of the IMMG shares, that Lawler had directed the transfer of shares from the named S-1 Shareholders to the ten Purported Purchasers (including Chen) at Client A's instruction, as part of a single transaction that included the sale of the restricted shares constituting a controlling interest in EPCC to Client A's company, and that Lawler had not wired the proceeds from the supposed sale to the named S-1 Shareholders.  Thus, Lawler knew, or was reckless in not knowing, that Client A in truth had orchestrated the purchase by his control group of all the shares of IMMG, and that the Purported Purchasers were not acting independently of Client A's company, which owned the controlling interest in IMMG, but rather were acting under its control or under common control with the issuer.  Thus, Lawler thereby knew, or was reckless in not knowing, that none of the IMMG shares were unrestricted (if indeed they ever had been unrestricted) because the shares were controlled by the issuer, its control person, or its affiliates.  Lawler intentionally or recklessly omitted these material facts from his opinion letter as part of the scheme to deceive the broker-dealer into accepting the stock for deposit and thereafter selling it out of the account.

109.     Indeed, while Lawler's opinion letter addressed whether the Purported Purchasers "controlled" EPCC, he failed to address whether they were "under the control of" the issuer, or under common control with the issuer, an equally important legal consideration in determining whether the shares were "restricted."

110.    In 2016, five other Purported Purchasers deposited their IMMG shares with broker-dealers located outside of the United States.  Lawler's law firm credit card was authorized to be charged for the deposit fees for four of these deposits.

**8.      The Purported Purchasers Who Lawler Assisted Sell IMMG Shares as Part of a Promotional Campaign Designed to Artificially Inflate the Share Price**

111.    IMMG began trading on September 14, 2015.  Over the following year, IMMG traded on only 20 days, from prices ranging from $0.15 to $0.42, and average volume on days traded of only 2,617 shares.

112.    Beginning in late January 2017, the trading volume for, and the price of, IMMG shares rose on trading that did not coincide with any public news or corporate announcement.

113.    Beginning on March 25, 2017, until the trading was suspended on April 4, 2017, there was a concerted promotional campaign tied to a press release issued by IMMG after market close on March 27, 2017.

114.    For example, on March 25, 2017, a penny stock promotional website, Stock Promotion Website A, referred email subscribers to an upcoming stock tip.  On March 27, 2017, Stock Promotion Website A sent another email stating, in part, "IMPORTANT ALERT: MY STOCK TIP OF THE YEAR IS COMING UP TOMORROW.  READ NOW!"  This email further stated, "I'm about to send you my special report tomorrow morning at some time between 9 AM and 10 AM EST."

115.    On March 27, 2017, IMMG issued a press release stating, in part, that its immunotherapy had "successfully passed early toxicology and efficacy studies" in mice and that the results would help the company "move forward with [their] conversations with the FDA."  On this day, 64,600 IMMG shares traded.

116.    On March 28, 2017, Stock Promotion Website A sent an email stating, in part, "This biotech [IMMG] may be on the cusp of getting FDA approval for its cancer therapies." This reference to "cusp of getting FDA approval" was, at a minimum, materially misleading. IMMG had in its March 27 press release announced only that it had had some success with mice and hoped to move forward in "conversations" with the FDA, and a press release it issued on January 6, 2017 made clear that no applications with the FDA were even pending and that IMMG had only "plans to file for the FDA's IND program for approval into Phase 1 human trials in mid-2018."

117.    Between March 28, 2017 and April 3, 2017, Stock Promotion Website A sent at least an additional ten promotional emails to their subscriber list similarly touting IMMG.

118.    On March 28, 2017, Stock Promotion Website B sent an email stating, in part, "IMMG seems to be on the verge on [sic] curing cancer according to its latest press release." This statement was, at a minimum, materially misleading given the public information contained in IMMG's press releases described above.  Stock Promotion Website B sent additional emails similarly touting IMMG on, at least, March 29 and April 4, 2017.

119.    On March 28, 2017, Stock Promotion Website C sent an email stating, in part, "This biotech may be on the cusp of getting FDA approval for its cancer therapies."  Stock Promotion Website C sent at least one additional email touting IMMG that same day and on April 3, 2017.

120.    Between March 28 and April 3, 2017, IMMG's average daily volume was 1,771,165, with a low of $0.40 and a high of $1.62.

121.    The Commission suspended trading in IMMG on April 4, 2017.

122.     By then, shares held in the name of Chen and Lin had been sold into the promotional campaign for proceeds of approximately $1.9 million and attempts were made to quickly move those proceeds out of the United States.

123.     These unregistered sales of IMMG shares, during a materially misleading promotional campaign, to unsuspecting public investors who were deprived of the knowledge that they were buying shares controlled by company insiders, were made possible by Lawler's fraudulent opinion letters opining that the stock could be traded without a registration statement and by Lawler's other efforts facilitating Client A and the Client A Group's purchase of the IMMG shares.

124.     On April 26, 2017, the Commission filed *SEC v. Lin*, No. 17 Civ. 3054 (S.D.N.Y.), charging them with violations of Section 5 of the Securities Act, and obtained an order freezing the assets held in the names of Chen and Lin.  On August 25, 2017, after Chen and Lin failed to appear, a default judgment was entered that, among other things, ordered disgorgement.

125.     Before these assets were frozen, $95,000 of the proceeds from these sales of IMMG stock were transferred out of the United States and ultimately went to an entity that also received funds from other promotional campaigns that artificially inflated prices of companies that the Client A Group had acquired, with Lawler's assistance, including BRKO discussed below.  This account was used to make additional payments to Lawler's law firm for unidentified reasons.

**9.     The Sales of IMMG Shares Were Not Registered**

126.     There was no registration statement filed or in effect with the Commission with respect to any of the sales of EPCC shares from the named S-1 Shareholders to the Purported Purchasers.

127.    There was no registration statement filed or in effect with the Commission in connection with any of the sales of IMMG shares from Lin and Chen to the public.

128.    There was no registration statement filed or in effect with the Commission in connection with the named S-1 Shareholder's sale of shares of EPCC to Entity A or in connection with Entity A's sale or offer to sell those shares.

**D.    BRKO**

**1.    Formation and S-1 Issuance of Shares**

129.    BRKO was incorporated by its then CEO ("BRKO Individual 1") on December 19, 2014 as a gym fitness apparel company.  A second individual ("BRKO Individual 2") was involved in the sale of BRKO and its shares.

130.    BRKO issued restricted stock to certain individuals, including BRKO Individual 1, on or about December 18, 2014.  BRKO also filed a Form S-1 registration statement with the Commission, effective on May 8, 2015, to register the public sale of certain of its stock. Although BRKO stated in its filings with the Commission that it was not a shell company, it had only nominal operations and nominal assets.

131.    After the registration statement became effective, BRKO purportedly sold shares pursuant to this registration to 27 United Kingdom-based individuals (also the "named S-1 Shareholders").

132.    However, as with IMMG, these individuals were not bona fide purchasers.  They either were unaware that shares had been purportedly "sold" to them or were straw purchasers of shares that were always under the control of the issuer or its affiliates.

133.    For example, Individual 1 admitted in representations he made to FINRA that he and BRKO's CFO solicited all of the named S-1 shareholders and that all these individuals were his friends and family.

134.    Bank records reflect that six of these 27 named S-1 Shareholders received funds matching the share purchase price from an unknown source shortly before they transferred funds for the purported purchases.  And at least one of the named S-1 Shareholders received from BRKO Individual 2 money that was used to fund the purchase.

135.    In addition, no stock certificates were sent to these 27 individuals for their purported purchases.  Instead, they were all sent to a single address associated with BRKO Individual 1, evidence that this stock was under the control of the issuer's control person.

136.    This indicates that the owners of BRKO, as with IMMG, engaged in a sham sale of shares to the named S-1 shareholders for the specific purpose of creating "unrestricted" shares that they in fact still controlled and which they could then resell together—along with the remaining shares of the company—to a shell company buyer, such as Client A and the Client A Group.

137.    As discussed below, there is further evidence that the named S-1 Shareholders were not bona fide purchasers and that their shares were always under the control of the issuer, which would render those shares restricted.

**2.    Bannister Begins to Assist in the Sale of BRKO**

138.    On August 20, 2015, BRKO became DTC eligible.  Later the same day, BRKO Individual 2 contacted Bannister by email and introduced her to BRKO Individual 1, who in turn emailed Bannister ostensibly asking for her help in obtaining capital to expand BRKO's business and get its products to America.  In his initial email to Bannister, BRKO Individual 1 also claimed that several of the S-1 shareholders were looking to sell some of their shares and asked if she could help.  This was part of a paper trail designed to hide the fact that BRKO Individuals 1 and/or 2 were in fact seeking to sell 100% of the shares of the company in a single transaction.

139.     Bannister said that she could help and sent BRKO Individual 1 a draft fee agreement stating that BRKO was retaining Bannister to "find lenders and borrow $500,000" that "will be used to fund operating requirement (sic) to increase production of clothing line." The fee agreement further provided that BRKO would pay Bannister an upfront $1,500 non-refundable retainer and thereafter a fee of 5% of loan proceeds she helped them obtain. However, instead of focusing on locating a lender for BRKO, Bannister immediately took steps to enhance BRKO's ability to be marketed for sale to those interested in acquiring a public shell company.

140.     Specifically, on August 24, 2015, Bannister emailed the named S-1 shareholder supposedly interested in selling some of her shares and told her that she thought she had a buyer for a portion of her shares.  Within days, Bannister agreed to purchase 5,000 shares from the named S-1 shareholder for $500.00.  Bannister financed her "purchase" of these shares from the $1,500 "fee" she had been paid by BRKO Individual 1 and she deposited the shares with a broker ("Broker 2").  Bannister subsequently admitted that she purchased those shares so that she could deposit them at a broker-dealer and ensure that BRKO could maintain its DTC eligibility. Bannister thereby enhanced BRKO's marketability to a shell buyer.

141.     The named S-1 Shareholder had purportedly paid $.004 per share for each of her shares.  5,000 shares at that price would be only $20.00.  When questioned by Commission staff, Bannister could not explain how it was agreed that she would pay $500.00 to purchase 5,000 shares of BRKO, but she admitted that she did not negotiate the sale price or number of shares to be bought with the named S-1 Shareholder.  Instead, she said it was likely she discussed the price and amount with BRKO Individual 2.

**3.     Lawler Begins to Represent the Client A Group in Purchase of BRKO**

142.     On September 14, 2015, Lawler began to communicate with Bannister about the

sale of BRKO to Client A.  Three days later, Lawler sent Bannister a term sheet for the sale of

100% of the shares of BRKO (including the 5,000 shares that Bannister herself held in her

Broker 2 securities account) for a total purchase price of $385,000.  Lawler listed a "Paul Lee" as

the representative of the purchasers of the shares, even though all of his known communications

regarding the purchase were with Client A.  There is no known evidence that any "Paul Lee" was

involved in the purchase.  Bannister testified that she does not know anyone named Paul Lee and

has never communicated with him, despite her being a signatory to the term sheet with him.  The

term sheet did not specify or break out the price to be paid to the named S-1 shareholders for

their shares and the price to be paid to the insiders for their restricted shares.

### 4. Lawler and Bannister Engage in Fraudulent Purchase and Deposit of BRKO Shares with a Broker-Dealer

143.    Lawler told Bannister that Client A wanted proof that a second broker-dealer

would accept BRKO shares for deposit before Client A would go forward with the deal.  Client

A's insistence on proof that the unregistered shares that were ostensibly to be sold to the

Purported Purchasers could be accepted as unrestricted by a broker-dealer was an indication to

Bannister and Lawler that the Client A Group were acquiring the shares with intent to sell.

144.    On September 15, 2015, Lawler introduced Bannister to a contact he had at

Broker 4, advising the broker-dealer that Bannister wanted to deposit shares, even though she

had no BRKO shares to deposit at that time because the only BRKO shares she held were

already on deposit with Broker 2.  Approximately one hour later, Lawler informed Bannister that

he would send her the funds—"whatever [Broker 4] needs"—for the deposit.

145.    Approximately two hours after that, despite not yet having any additional shares,

Bannister told Broker 4 via email that she had BRKO shares that she wanted to deposit.

146.    Approximately eight minutes after Bannister's email to Broker 4, the same named

S-1 Shareholder from whom Bannister had already purchased 5,000 shares emailed Bannister offering to sell her an additional 5,000 BRKO shares.  Bannister knew when she received this email that it was not a mere coincidence, and she subsequently admitted that she believed the offer was orchestrated by BRKO Individual 2.  Bannister agreed to the "purchase" the following day, September 16, by email.

147.    Bannister knew that she was not legitimately purchasing the shares because these shares would need to be returned to Client A or someone under his control on the completion of the deal, so that 100 % of BRKO shares could be sold to the Client A Group.  In fact, after the deal closed, Lawler and Bannister attempted to transfer the shares to another individual at Client A's direction, as set forth in more detail below.

148.    On September 24, 2015, Lawler wired Bannister $1,600 to pay for and deposit these shares, noting in the wire, "fees to cover deposit of shares of Broke Out."  Lawler also invoiced Client A for $1,600, describing the debit from the trust account as "Withdrawal Fees to cover deposit of shares of Broke Out."  Bannister paid the named S-1 Shareholder the next day by wire.  Despite this, the paperwork for the sale of these shares, including the stock purchase agreement signed by Bannister and the named S-1 shareholder, and the transfer agreement signed by BRKO Individual 1, were backdated to September 15, 2015, the day on which Lawler introduced Bannister to Broker 4 and she falsely represented that she had shares to deposit.

### 5.    Bannister and Lawler Submit Fraudulent Documents, and Make Fraudulent Misrepresentations and Omissions, to the Broker–Dealer

149.    Bannister submitted the stock purchase agreement, which she knew to be fraudulent, to Broker 4 to convince it to accept her BRKO shares for deposit and for trading to the public.  As set forth below, Lawler referred to this stock purchase agreement, which he knew to be fraudulent, in his opinion letter to Broker 4 to convince it to accept Bannister's BRKO

shares for deposit and for trading to the public.

150.     Broker 4 asked Bannister to make certain representations as part of its regular due diligence designed to give Broker 4 comfort that it was not participating in an unregistered distribution of securities.  On September 24, 2015, Bannister stated in writing to Broker 4 that she did not "have any relationship with the issuer or its subsidiaries" and that she had not and would not "make any payment to any person or entity in connection with [her] proposed sale of [BRKO shares]."  She also signed a statement that she owned the shares and that they were "acquired in a bona fide and legal transaction."

151.     Broker 4 and its clearing firm sought additional information from Bannister as to how she knew the named S-1 Shareholder and BRKO Individual 1.  Bannister falsely stated in an email that she "came upon" BRKO and contacted BRKO Individual 1 when doing "some research on clothing lines."  She also falsely stated, "I did not earn a fee [from BRKO], I am not an affiliate of the Company, nor will I be paid for this by the Company."

152.     Each of the referenced statements by Bannister to Broker 4 was knowingly false. Bannister learned of BRKO through BRKO Individual 2, who was searching for a buyer for the company; she did have a relationship with the issuer because she had agreed to assist it in obtaining capital in return for a commission and had already been paid a $1,500 non-refundable fee; she was obviously engaged in assisting BRKO to sell 100% of its shares to the Client A Group; and she stood to earn $10,000 for her services if the company was sold, which was the sale she was trying to facilitate by depositing the shares at Broker 4.

153.     Bannister's representation that she would not make any payment to anyone in connection with her sale of those shares was also false and/or misleading.  If she were to sell those shares, she would have to return the proceeds of those sales to the person who had funded

her purchase or to someone he directed the payment to.

154.    In fact, Bannister subsequently paid back to an account controlled by Lawler the proceeds from her sale of this stock.

155.    Further, as Bannister well knew given her experience in this industry, the required representation that she would not "make any payment to any person or entity in connection with [her] proposed sale of [BRKO shares]" was intended to assure Broker 4 that she was not a straw owner acting on behalf of an undisclosed true owner who she would have to pay back once the shares were sold.  Yet, Bannister knew she was a straw owner.

156.    Bannister did not own the shares, given that she had been provided money by Lawler to purchase the shares.  And she had not acquired the shares in a bona fide transaction but rather had acquired them on behalf of a third party whom had funded the purchase and expected the shares to be transferred to him as part of the 100% percent sale of all BRKO shares.  Indeed, Bannister subsequently admitted that the shares were not really hers and that "it was a purchase, yes, but I was doing it for someone."

157.    Broker 4 further requested a legal opinion explaining the "[n]ature of this overall transaction" and "[c]onsideration paid."  Lawler drafted the opinion letter and sent it to Broker 4 on October 12, 2015.  Lawler falsely stated that Bannister had purchased the shares on September 15, 2015, which he knew to be misleading because Bannister had not even been offered the shares by the named S-1 Shareholder at the time on September 15 when she told the broker-dealer she had shares to deposit.

158.    Lawler also opined that Bannister was "able to freely sell the Stock," which he knew, or was reckless in not knowing, was false because, among other facts, he knew that Bannister was not a bone fide purchaser of the BRKO shares; that the purchase was funded by

Lawler from Client A's funds; that Bannister was an agent of the issuer; and that she had purchased and deposited the shares at the behest of Client A, whose group was acquiring control of 100% of BRKO shares, thus voiding any status the shares might have previously had, if any, as unrestricted "freely trading" shares.

159.     Lawler also omitted from the letter material facts that Broker 4 would have wanted to know, including that the Client A Group was seeking to acquire control of 100% of the company; that Lawler represented Client A; that Lawler had played a large role in orchestrating the transaction by directing Bannister to buy and deposit the shares; that Lawler, with Client A's funds, had paid for Bannister to purchase and deposit the shares; that in order to facilitate the sale Bannister acted at the direction of the person who wanted to acquire control of the company; that Bannister was an agent brokering the sale of BRKO; and that Lawler and Bannister were expecting to be paid commissions once the deal was finalized (in addition to the legal fees Lawler received).

160.     Lawler's legal opinion that the shares were "freely tradeable" was based, in part, on the false appearance that the named S-1 Shareholders had independently and legitimately purchased their shares pursuant to the S-1 registration statement.  However, Lawler knew, but did not disclose to the broker-dealer, that all of the named S-1 Shareholders were selling all of their shares as part of a single transaction orchestrated by the issuer and/or its affiliates who were selling control of the company and all of its shares to the Client A Group.  This was a significant indication that the named S-1 Shareholders' stock was in fact controlled by the issuer and/or its affiliates, such that their shares would not be "unrestricted" upon transfer to the Client A Group. Any purchaser of this stock would be acquiring it from the issuer and/or its affiliates, and if the purchasing group acquired all of the stock of the company, that stock would be control stock.

Lawler failed to disclose this material fact to the broker-dealer and frustrated its efforts to conduct its necessary due diligence.

161.    Client A gave Lawler the names of ten individuals from the Philippines and Malaysia who were purportedly buying the shares from the named S-1 Shareholders (also the "Purported Purchasers").  It was suspicious, at the least, and unlikely, that these individuals, ostensibly acting entirely independently of Lawler's client, would be willing to pay for shares of an unprofitable U.K.-based shell company supposedly engaged in selling sports apparel, and further suspicious that they were willing to do so in amounts that precisely matched the amounts that the named S-1 Shareholders were ostensibly selling.  This unlikely scenario, combined with the fact that all ten were in fact acting in concert with Lawler's client, who wanted to acquire the restricted shares of BRKO and was insistent that the ostensibly unrestricted shares being purchased by the Purported Purchasers be accepted as unrestricted by broker-dealers and eligible for immediate trading to the public, was a significant indication to Lawler that the Purported Purchasers were in or under the control of the Client A Group, which was acquiring control of BRKO.  This would render the Purported Purchasers' shares restricted, as they were under the control of the issuer.

162.    Indeed, while Lawler's opinion letter addressed whether the Purported Purchasers "controlled" BRKO, he failed to address whether they were "under the control of" or "in common control with" the issuer, an equally important legal consideration in determining whether the shares should be deemed "restricted."

163.    Accordingly, Lawler's legal opinion that the shares were "freely tradeable" was intentionally or recklessly fraudulent and misleading, given his knowledge of and failure to

disclose material facts known to him that contradicted his opinion and his omission of important legal considerations.

164.     Indeed, as set forth above and herein, there is significant evidence that the named S-1 Shareholders were not in control of the BRKO stock issued in their names.  The named S-1 Shareholders do not appear to have negotiated the price that they were going to be paid for the shares and indeed they do not appear to have been paid anything for their shares (besides, possibly, the money Bannister sent for the shares she deposited).  In fact, upon closing in December 2015, Lawler directed the escrow agent to send the entire payment for both the restricted shares and all of the named S-1 Shareholders' shares to a single account provided by BRKO Individual 2.

165.     A review of that account shows no subsequent transfers of funds to the BRKO S-1 Shareholders.

166.     These facts, which Lawler either falsely set forth or omitted from his legal opinion, were material to a broker-dealer's decision whether to accept the Bannister shares for deposit.

167.     While Bannister's share deposit was pending, Lawler and Bannister finalized the deal documents for the anticipated sale of BRKO, which made clear that all of the BRKO shares were to be sold as part of one transaction, with the restricted shares transferred to the name of Digitrade and the remaining shares transferred to the names of the Purported Purchasers.

168.     According to BRKO's Form 10-K, filed with the Commission on March 1, 2016, Digitrade "was controlled by . . . an individual residing in Malaysia."

### 6.     Lawler Directs the Transfer Agent to Issue Free-Trading BRKO Shares to the Purported Purchasers

169.     Lawler also sent a letter to the transfer agent attaching the share certificates and

executed stock powers (documents purportedly signed by the named S-1 Shareholders appointing the transfer agent as the attorney for purposes of transferring the shares to the Purported Purchasers), and directing the transfer agent to transfer the shares to the names of the Purported Purchasers as "free trading shares." Instead of directing the transfer agent to send the share certificates to the Purported Purchasers, Lawler instructed the transfer agent to send those share certificates to him.

170.    The wires that the Purported Purchasers sent to an escrow agent for the shares referred to purchases of tour packages in Colorado, and not the purchase of BRKO shares.

**7.      Lawler Directs Bannister to Engage in Fraudulent Offer to Sell and Bid to Buy BRKO Shares to Appease Client A**

171.    On December 4, 2015, Lawler told Bannister that Client A refused to close on the deal until there was a published offer and bid for BRKO stock which would demonstrate that there was a price at which BRKO shares could be immediately traded. This was further evidence that Lawler and Bannister knew, or were reckless in not knowing, that they were participating in a series of transactions designed to result in an illegal distribution of unrestricted securities from the issuer, BRKO, to the Client A Group and, ultimately, to the public.

172.    That same day, Bannister offered to sell 2,500 shares held in her account with Broker 2 and placed a sham bid (at a much lower price, so that the offer would not be hit and result in a sale) in her account with Broker 4. She then sent Lawler and Client A Skype messages stating that she had placed an open bid.

173.    Later that day, Lawler authorized the escrow attorney to release the funds for the shares, which indicated that Client A had agreed to close the deal. Those proceeds included $10,000 to Bannister, the amount referenced in her fee arrangement with BRKO, and $5,000 to Lawler.

174.    Although Bannister did not intend for her offer to sell 2,500 shares on December 4 to result in a sale, a market-maker unexpectedly purchased the shares.  Thus, BRKO began trading on December 4, 2015, with the sale of these shares.  From December 4, 2015 through March 6, 2016, BRKO traded only on 11 days with a share price between $0.50 and $3.45 and an average daily trading volume of 2,516 shares.

175.    Bannister kept the remaining 7,500 shares on deposit for several more months, until Lawler orchestrated their return to someone under Client A's control via attempted matched orders on the open market.

176.    Specifically, on February 3, 2016, Bannister, at Lawler's direction, sold the 5,000 shares held at Broker 2 for $0.50 to an individual who bid in coordination with Bannister's offer to sell.

177.    The same day, she offered her remaining 2,500 shares held at Broker 4 for $0.51 per share.  With respect to this sale, Bannister has admitted: "I was told to sell my shares.  I was told to hit the bid.  From what I understood, Scott Lawler's buyers were on the bid waiting for the stock.  That was part of them keeping the hundred percent control."  But the shares unexpectedly—and contrary to Lawler and Bannister's plan—were bought by a market-maker. Lawler and Client A told Bannister that they were angry that Bannister's shares did not end up with the expected purchaser.  Bannister immediately attempted to buy back some of the shares through her Broker 4 account, placing a bid to buy 250 shares at $1, but Broker 4 refused to execute the trade, noting internally that her request (that is, bidding at almost twice the price to buy shares that she had just sold) raised red flags.  Broker 4 ultimately closed Bannister's account as a result of her suspicious behavior.

178.    Bannister did not keep the proceeds of her unintended sale and subsequently

wired them to an account at Lawler's firm.  Legal invoices reflect that Lawler credited these

funds to a general distribution account for Client A's company.

### 8.    The BRKO Promotional Campaign Begins

179.    On March 7, 2016, a promotional campaign touting BRKO began.  These touts

made claims such as that BRKO could be at "potential valuations in the billions of dollars" and

"could realistically jump 200% or more within hours."  This pushed the share price to a high of

$14.00 with average daily trading of 477,694 shares.  Client A was the contact person for at least

one mass mailing email account that promoted BRKO.  On March 17, 2016, the Commission

suspended trading in BRKO.

180.    By then, accounts in the name of two of the Purported Purchasers had sold into

the promotional campaign for proceeds of approximately $1.3 million.  Within days, the majority

of these proceeds were wired out of the United States and ultimately went to an entity that also

received funds from other promotional campaigns that artificially inflated prices of companies

that the Client A Group had acquired, with Lawler's assistance.  This account was used to make

additional payments to Lawler's law firm for unidentified reasons.

181.    These unregistered sales of BRKO shares, during a materially misleading

promotional campaign, to unsuspecting public investors who were deprived of the knowledge

that they were buying shares controlled by company insiders, were made possible by Lawler's

fraudulent opinion letter opining that the stock could be traded without a registration statement,

by Bannister's false statements and omissions of material facts to the brokers with whom she

deposited BRKO shares, by Lawler and Bannister's involvement in Bannister's fraudulent offers

and bids of IMMG shares and by Lawler and Bannister's numerous other efforts facilitating

Client A and the Client A Group's purchase of the BRKO shares.

182.    When Bannister was subsequently contacted by a government investigator, she

lied about her involvement in the BRKO scheme and made false and misleading statements and omitted material facts.  For example, she falsely stated, in substance, that she had decided to buy stock in BRKO because she thought the clothing line was fantastic.  She also falsely stated that no one had told or directed her to buy stock in BRKO and that she had not opened up the brokerage accounts for the specific purpose of depositing the BRKO shares.  Further, she falsely stated that she decided to sell those shares only when she realized it would be too expensive to bring the BRKO clothing line to the U.S.  Bannister also initially gave false reasons for why she had tried to buy back the stock that she had offered to sell on February 3, 2016 (which had been unexpectedly purchased by a market maker instead of the intended buyer associated with the Client A Group).  Despite being asked numerous questions about the circumstances surrounding her purchases of BRKO stock, Bannister did not disclose during these interviews that Lawler had provided her with the funds for her second purchase of BRKO shares.

183.    There was no registration statement filed or in effect with the Commission for any of the sales of BRKO shares from the named S-1 Shareholders to the Purported Purchasers.

184.    There was no registration statement filed or in effect with the Commission for any of the sales of BRKO shares from the two Purported Purchasers to the public.

185.    There was no registration statement filed or in effect with the Commission for the BRKO shares that Bannister offered to sell and/or sold to the public.

**E.    NINK**

186.    Lawler engaged in matched trades of NINK's securities from December 16, 2016 to January 24, 2018.  A "matched trade" is defined as trades executed on orders entered for the purchase or sale of securities that are of substantially the same size, at substantially the same time, and at substantially the same price.

187.    Lawler coordinated these matched trades for no legitimate economic reason. Instead, he intended to mislead investors about the extent of the trading activity in the market for the NINK stock.

188.    During this time, Lawler served as NINK's Corporate Counsel.

189.    Lawler traded through a brokerage account at a broker-dealer ("Broker 5") in the name of International Securities Holdings ("ISH"), for which Lawler was the signatory and sole authorized user.  ISH was incorporated on or around December 5, 2016, by Lawler.  Lawler opened the account at Broker 5 ten days later, on December 15, 2016, one day before the trading began.

190.    Lawler engaged in matched trades of NINK securities with an account of another individual (the "NINK Trader") at Broker 2.  Prior to the start of trading by Lawler and the NINK Trader, there was no trading in NINK shares.  Through a series of trades from December 19, 2016 through April 4, 2017, Lawler used his ISH account at Broker 5 to purchase from the NINK Trader a total of 295,082 shares, through 55 trades that executed against each other and had orders placed at substantially the same time, price, and quantity, at gradually increasing prices ranging from $0.40 to $1.85 per share.[5]  For example:

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 12/20/2016 | 2:18:56 PM | 2,500 | $0.40 | 12/20/2016 | 2:18:14 PM | $0.40 | 2,500 |
| ISH | BUY | 12/20/2016 | 2:18:56 PM | 2,500 | $0.40 | 12/20/2016 | 11:53:15 AM | $0.40 | 2,500 |
| NINK Trader | SELL | 12/21/2016 | 12:19:03 PM | 2,500 | $0.45 | 12/21/2016 | 11:52:14 AM | $0.45 | 5,000 |
| ISH | BUY | 12/21/2016 | 12:19:04 PM | 2,500 | $0.45 | 12/21/2016 | 12:18:53 PM | $0.42 | 5,000 |
| NINK Trader | SELL | 12/22/2016 | 11:48:07 AM | 5,000 | $0.47 | 12/22/2016 | 11:46:49 AM | $0.47 | 5,000 |
| ISH | BUY | 12/22/2016 | 11:48:07 AM | 5,000 | $0.47 | 12/22/2016 | 11:04:04 AM | $0.47 | 5,000 |

[5] Attached as Exhibit A is a chart of all 55 of the trades.

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 12/22/2016 | 11:52:59 AM | 5,000 | $0.50 | 12/22/2016 | 11:43:23 AM | $0.50 | 5,000 |
| Lawler Joint Account | BUY | 12/22/2016 | 11:52:59 AM | 5,000 | $0.50 | 12/22/2016 | 11:52:47 AM | $0.50 | 5,000 |
| NINK Trader | SELL | 12/23/2016 | 11:12:57 AM | 10,000 | $0.50 | 12/23/2016 | 11:12:48 AM | $0.50 | 10,000 |
| ISH | BUY | 12/23/2016 | 11:12:57 AM | 10,000 | $0.50 | 12/23/2016 | 11:11:28 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/23/2016 | 3:46:18 PM | 10,000 | $0.50 | 12/23/2016 | 3:46:09 PM | $0.50 | 10,000 |
| ISH | BUY | 12/23/2016 | 3:46:19 PM | 10,000 | $0.50 | 12/23/2016 | 11:20:20 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/27/2016 | 9:45:31 AM | 10,000 | $0.50 | 12/27/2016 | 9:45:20 AM | $0.50 | 10,000 |
| ISH | BUY | 12/27/2016 | 9:45:32 AM | 10,000 | $0.50 | 12/27/2016 | 9:17:05 AM | $0.50 | 10,000 |

191.    The trades between Lawler and the NINK Trader represented over 40% of the total market volume during this period.  Of the 55 trades, 53 either maintained the previous price or increased the price.  For example, on December 19, 2016, a trade between Lawler and the NINK Trader for 1,000 shares at $0.51 per share (the only trade of the day) was a 325% increase from the prior closing price of $0.12.

192.    On April 4, 2017—the day the Commission suspended trading in three issuers associated with Lawler and Client A, including IMMG—Lawler stopped trading in NINK for about a month.

193.    Then, from May 15, 2017 to January 24, 2018, Lawler purchased an additional 60,095 NINK shares for about $135,000 in the ISH account at Broker 5.  Lawler and the NINK Trader engaged in at least nine matched trades during this period, eight of which either maintained or increased the price of the shares.  Collectively, trading by Lawler and the NINK Trader accounted for over 60% of the total market volume during this period.

194.    A wash trade is a form of market manipulation in which an investor simultaneously sells and buys the same financial instruments to create misleading, artificial

activity in the marketplace.

195.    Lawler engaged in two wash trades, executed on June 5, 2017, seconds apart at two different prices, where he traded NINK shares between the ISH account at Broker 5 and another account in his own name.  Both trades increased the price of NINK shares.

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|------|------|------|----------------|--------------------|-----------------|------------|------------|-------------|----------------|
| Lawler | SELL | 6/5/2017 | 9:31:54 AM | 500 | $2.00 | 6/5/2017 | 9:31:54 AM | $2.00 | 500 |
| ISH | BUY | 6/5/2017 | 9:31:54 AM | 500 | $2.00 | 6/4/2017 | 6:52:06 PM | $2.15 | 2,000 |
| Lawler | SELL | 6/5/2017 | 9:31:56 AM | 500 | $2.10 | 6/5/2017 | 9:31:56 AM | $2.10 | 500 |
| ISH | BUY | 6/5/2017 | 9:31:56 AM | 500 | $2.10 | 6/4/2017 | 6:53:06 PM | $2.15 | 2,000 |

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Both Defendants)

196.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 195 of this Complaint.

197.    From in or about February 2015 through January 2018, Lawler, and from in or about August 2015 through March 2016, Bannister, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the offer or sale of securities: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would operate as a fraud or deceit upon the purchaser.

198.    By reason of the foregoing, Lawler and Bannister, directly or indirectly, singly or

in concert, have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Both Defendants)

199.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 195 of this Complaint.

200.    From in or about February 2015 through January 2018, Lawler, and from in or about August 2015 through March 2016, Bannister, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

201.    By reason of the foregoing, Lawler and Bannister, directly or indirectly, singly or in concert, have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Sections 5(a) and (c) of the Securities Act
### (Both Defendants)

202.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 195 of this Complaint.

203.     From in or about February 2015 through January 2018, Lawler, and from in or about August 2015 through March 2016, Bannister, directly or indirectly, and notwithstanding the fact that there was no applicable exemption:  (a) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; and (b) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.  No valid registration statement was filed with the Commission or in effect with respect to the offers and sales of securities of BRKO for which Bannister and Lawler were necessary participants and/or substantial factors, and no valid registration statement was filed with the Commission or in effect with respect to the offers and sales of securities of EPCC/IMMG for which Lawler was a necessary participant and/or substantial factor.

204.     These offers and sales of BRKO and EPCC/IMMG securities took place in the United States in that:  (a) sales were executed by broker-dealer firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to sales passed in the United States.

205.     By reason of the foregoing, Lawler and Bannister, directly or indirectly, singly or in concert, have violated and, unless restrained and enjoined, will continue to violate Section 5 of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 9(a)(1) and 9(a)(2) of the Exchange Act
### (Lawler)

206.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 195 of this Complaint.

207.    From in or about December 2016 through January 2018, Lawler, directly or indirectly, singly or in concert, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange:

      (a)    For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security: (1) effected transactions in such security which involved no change in beneficial ownership thereof; or (2) entered an order or orders for the purchase or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale or purchase of any security, had been or was to be entered by or for the same or different parties; or

      (b)    Effected, alone or with one or more other persons, a series of transactions in any security other than a government security or in connection with any security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

208.    By reason of the foregoing, Lawler, directly or indirectly, singly or in concert, violated, and unless enjoined and restrained will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently restrain and enjoin Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and, with respect to Lawler, Section 9(a) of the Exchange Act [15 U.S.C. §§ 78i(a)].

### II.

Order Defendants to disgorge all ill-gotten gains obtained as a result of the violations alleged in this Complaint, as well as prejudgment interest thereon.

### III.

Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], in amounts to be determined by the Court.

### IV.

Order such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands for this

case to be tried to a jury.


Dated:          July 12, 2019
                New York, New York

                            By:  _____
                                 Marc P. Berger
                                 Lara S. Mehraban
                                 Steven G. Rawlings
                                 Kevin P. McGrath
                                 Hane L. Kim
                                 Jennifer K. Vakiener
                                 SECURITIES AND EXCHANGE COMMISSION
                                 New York Regional Office
                                 200 Vesey Street, Suite 400
                                 New York, New York 10281-1022
                                 (212) 336-0533 (McGrath)
                                 Email: McGrathK@sec.gov

**Exhibit A**
**Chart of NINK Trading**

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 12/19/2016 | 3:49:44 PM | 1,000 | $0.51 | 12/16/2016 | 12:34:01 PM | $0.51 | 2,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/19/2016 | 3:49:44 PM | 1,000 | $0.51 | 12/19/2016 | 3:49:31 PM | $0.51 | 1,000 |
| NINK Trader | SELL | 12/20/2016 | 11:45:22 AM | 3,000 | $0.51 | 12/16/2016 | 12:34:01 PM | $0.51 | 6,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/20/2016 | 11:45:23 AM | 3,000 | $0.51 | 12/20/2016 | 11:44:56 AM | $0.51 | 3,000 |
| NINK Trader | SELL | 12/20/2016 | 2:18:56 PM | 2,500 | $0.40 | 12/20/2016 | 2:18:14 PM | $0.40 | 2,500 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/20/2016 | 2:18:56 PM | 2,500 | $0.40 | 12/20/2016 | 11:53:15 AM | $0.40 | 2,500 |
| NINK Trader | SELL | 12/21/2016 | 12:19:03 PM | 2,500 | $0.45 | 12/21/2016 | 11:52:14 AM | $0.45 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/21/2016 | 12:19:04 PM | 2,500 | $0.45 | 12/21/2016 | 12:18:53 PM | $0.42 | 5,000 |
| NINK Trader | SELL | 12/21/2016 | 12:42:35 PM | 2,500 | $0.45 | 12/21/2016 | 11:52:14 AM | $0.45 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/21/2016 | 12:42:35 PM | 4,000 | $0.45 | 12/21/2016 | 12:42:00 PM | $0.45 | 2,500 |
| NINK Trader | SELL | 12/22/2016 | 10:47:25 AM | 2,500 | $0.47 | 12/22/2016 | 9:31:51 AM | $0.47 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/22/2016 | 10:47:25 AM | 2,500 | $0.47 | 12/22/2016 | 10:47:13 AM | $0.47 | 2,500 |
| NINK Trader | SELL | 12/22/2016 | 11:48:07 AM | 5,000 | $0.47 | 12/22/2016 | 11:46:49 AM | $0.47 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/22/2016 | 11:48:07 AM | 5,000 | $0.47 | 12/22/2016 | 11:04:04 AM | $0.47 | 5,000 |
| NINK Trader | SELL | 12/22/2016 | 11:52:59 AM | 5,000 | $0.50 | 12/22/2016 | 11:43:23 AM | $0.50 | 5,000 |
| William S. Lawler Joint Account | BUY | 12/22/2016 | 11:52:59 AM | 5,000 | $0.50 | 12/22/2016 | 11:52:47 AM | $0.50 | 5,000 |

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 12/23/2016 | 11:12:57 AM | 10,000 | $0.50 | 12/23/2016 | 11:12:48 AM | $0.50 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/23/2016 | 11:12:57 AM | 10,000 | $0.50 | 12/23/2016 | 11:11:28 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/23/2016 | 3:46:18 PM | 10,000 | $0.50 | 12/23/2016 | 3:46:09 PM | $0.50 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/23/2016 | 3:46:19 PM | 10,000 | $0.50 | 12/23/2016 | 11:20:20 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/27/2016 | 9:45:31 AM | 10,000 | $0.50 | 12/27/2016 | 9:45:20 AM | $0.50 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/27/2016 | 9:45:32 AM | 10,000 | $0.50 | 12/27/2016 | 9:17:05 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/27/2016 | 11:35:51 AM | 10,000 | $0.50 | 12/27/2016 | 11:35:40 AM | $0.50 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/27/2016 | 11:35:51 AM | 10,000 | $0.50 | 12/27/2016 | 11:04:07 AM | $0.50 | 10,000 |
| NINK Trader | SELL | 12/27/2016 | 11:50:08 AM | 5,000 | $0.55 | 12/23/2016 | 2:37:17 PM | $0.55 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/27/2016 | 11:50:09 AM | 5,000 | $0.55 | 12/27/2016 | 11:49:25 AM | $0.55 | 5,000 |
| NINK Trader | SELL | 12/27/2016 | 3:51:14 PM | 5,000 | $0.55 | 12/27/2016 | 12:07:29 PM | $0.55 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/27/2016 | 3:51:14 PM | 5,000 | $0.55 | 12/27/2016 | 3:49:47 AM | $0.55 | 5,000 |
| NINK Trader | SELL | 12/28/2016 | 3:37:02 PM | 10,000 | $0.55 | 12/28/2016 | 9:28:05 AM | $0.54 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/28/2016 | 3:37:02 PM | 10,000 | $0.55 | 12/28/2016 | 3:35:46 PM | $0.55 | 10,000 |
| NINK Trader | SELL | 12/29/2016 | 11:02:51 AM | 5,000 | $0.55 | 12/27/2016 | 12:07:29 PM | $0.55 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 12/29/2016 | 11:02:52 AM | 5,000 | $0.55 | 12/29/2016 | 11:02:29 AM | $0.55 | 30,000 |
| NINK Trader | SELL | 1/3/2017 | 11:32:36 AM | 20,000 | $0.60 | 1/3/2017 | 11:34:10 AM | $0.59 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/3/2017 | 11:32:36 AM | 20,000 | $0.60 | 1/3/2017 | 11:31:07 AM | $0.60 | 20,000 |

A-2

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|------|------|------|----------------|--------------------|-----------------|------------|------------|-------------|----------------|
| NINK Trader | SELL | 1/4/2017 | 3:23:20 PM | 5,000 | $0.70 | 1/4/2017 | 3:09:45 PM | MKT | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/4/2017 | 3:23:20 PM | 5,000 | $0.70 | 1/4/2017 | 3:23:10 PM | $0.70 | 5,000 |
| NINK Trader | SELL | 1/5/2017 | 12:29:58 PM | 5,000 | $0.70 | 1/5/2017 | 10:00:44 AM | MKT | 20,000 |
| William S. Lawler | BUY | 1/5/2017 | 12:29:58 PM | 5,000 | $0.70 | 1/5/2017 | 12:29:50 AM | $0.70 | 5,000 |
| NINK Trader | SELL | 1/11/2017 | 10:18:41 AM | 10,000 | $0.70 | 1/11/2017 | 8:44:52 AM | $0.70 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/11/2017 | 10:18:42 AM | 10,000 | $0.70 | 1/11/2017 | 10:18:29 AM | $0.70 | 20,000 |
| NINK Trader | SELL | 1/13/2017 | 10:15:48 AM | 5,000 | $0.70 | 1/13/2017 | 9:36:00 AM | MKT | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/13/2017 | 10:15:48 AM | 5,000 | $0.70 | 1/13/2017 | 10:07:46 AM | $0.70 | 5,000 |
| NINK Trader | SELL | 1/17/2017 | 12:33:46 PM | 7,542 | $0.70 | 1/17/2017 | 9:15:44 AM | MKT | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/17/2017 | 12:33:46 PM | 7,542 | $0.70 | 1/17/2017 | 12:31:18 PM | $0.70 | 10,000 |
| NINK Trader | SELL | 1/24/2017 | 9:30:09 AM | 10,000 | $0.75 | 1/24/2017 | 9:30:07 AM | $0.70 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/24/2017 | 9:30:09 AM | 10,000 | $0.75 | 1/23/2017 | 2:13:42 PM | $0.70 | 5,000 |
| NINK Trader | SELL | 1/24/2017 | 9:50:40 AM | 5,000 | $0.70 | 1/24/2017 | 9:30:07 AM | $0.70 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/24/2017 | 9:50:40 AM | 5,000 | $0.70 | 1/23/2017 | 2:14:20 PM | $0.75 | 10,000 |
| NINK Trader | SELL | 1/24/2017 | 12:38:48 PM | 5,000 | $0.70 | 1/24/2017 | 9:30:07 AM | $0.70 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/24/2017 | 12:38:48 PM | 5,000 | $0.70 | 1/24/2017 | 10:39:57 AM | $0.70 | 10,000 |
| NINK Trader | SELL | 1/25/2017 | 2:36:10 PM | 15,000 | $0.70 | 1/25/2017 | 9:26:01 AM | $0.70 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 1/25/2017 | 2:36:10 PM | 15,000 | $0.70 | 1/25/2017 | 1:21:03 PM | $0.70 | 15,000 |

A-3

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 2/3/2017 | 11:29:50 AM | 1,000 | $0.80 | 2/3/2017 | 11:29:49 AM | $0.80 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 2/3/2017 | 11:29:50 AM | 1,000 | $0.80 | 2/3/2017 | 11:29:28 AM | $0.80 | 5,000 |
| NINK Trader | SELL | 3/1/2017 | 9:56:24 AM | 10,000 | $0.82 | 2/3/2017 | 11:29:49 AM | $0.80 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/1/2017 | 9:56:24 AM | 10,000 | $0.82 | 3/1/2017 | 9:54:29 AM | $0.85 | 20,000 |
| NINK Trader | SELL | 3/1/2017 | 11:10:34 AM | 10,000 | $0.85 | 3/1/2017 | 11:07:53 AM | $0.85 | 20,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/1/2017 | 11:10:35 AM | 10,000 | $0.85 | 3/1/2017 | 9:54:29 AM | $0.85 | 20,000 |
| NINK Trader | SELL | 3/15/2017 | 11:33:39 AM | 8,500 | $0.94 | 3/15/2017 | 11:14:13 AM | $0.94 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/15/2017 | 11:33:39 AM | 8,500 | $0.94 | 3/15/2017 | 11:30:36 AM | $0.94 | 10,000 |
| NINK Trader | SELL | 3/15/2017 | 11:40:56 AM | 1,500 | $0.94 | 3/15/2017 | 11:14:13 AM | $0.94 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/15/2017 | 11:40:56 AM | 1,500 | $0.94 | 3/15/2017 | 11:40:44 AM | $0.94 | 1,500 |
| NINK Trader | SELL | 3/15/2017 | 12:05:08 PM | 2,500 | $0.98 | 3/15/2017 | 12:00:59 PM | $0.98 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/15/2017 | 12:05:09 PM | 2,500 | $0.98 | 3/15/2017 | 12:04:59 PM | $0.98 | 2,500 |
| NINK Trader | SELL | 3/22/2017 | 3:59:00 PM | 2,100 | $0.98 | 3/15/2017 | 12:00:59 PM | $0.98 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/22/2017 | 3:59:00 PM | 2,100 | $0.98 | 3/17/2017 | 9:37:56 AM | $0.98 | 2,500 |
| NINK Trader | SELL | 3/27/2017 | 11:13:12 AM | 1,000 | $0.96 | 3/27/2017 | 10:58:14 AM | $0.95 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 11:13:12 AM | 1,000 | $0.96 | 3/27/2017 | 11:12:59 AM | $0.96 | 7,500 |
| NINK Trader | SELL | 3/27/2017 | 11:14:38 AM | 5,600 | $0.96 | 3/27/2017 | 10:58:14 AM | $0.95 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 11:14:38 AM | 5,600 | $0.96 | 3/27/2017 | 11:12:59 AM | $0.96 | 7,500 |

A-4

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| NINK Trader | SELL | 3/27/2017 | 11:20:33 AM | 2,500 | $0.96 | 3/27/2017 | 10:58:14 AM | $0.95 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 11:20:33 AM | 2,500 | $0.96 | 3/27/2017 | 11:20:14 AM | $0.96 | 3,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:20:13 PM | 1,000 | $0.97 | 3/27/2017 | 3:19:54 AM | $1.01 | 2,500 |
| NINK Trader | SELL | 3/27/2017 | 3:20:13 PM | 1,000 | $0.97 | 3/27/2017 | 11:27:02 AM | $1.00 | 10,000 |
| NINK Trader | SELL | 3/27/2017 | 3:21:25 PM | 100 | $1.00 | 3/27/2017 | 3:27:02 AM | $1.00 | 100 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:21:25 PM | 100 | $1.00 | 3/27/2017 | 3:19:54 PM | $1.01 | 2,500 |
| NINK Trader | SELL | 3/27/2017 | 3:21:26 PM | 1,500 | $1.01 | 3/27/2017 | 11:27:02 AM | $1.00 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:21:26 PM | 1,400 | $1.01 | 3/27/2017 | 3:19:54 PM | $1.01 | 2,500 |
| NINK Trader | SELL | 3/27/2017 | 3:23:38 PM | 5,000 | $1.01 | 3/27/2017 | 11:27:02 AM | $1.00 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:23:38 PM | 5,000 | $1.01 | 3/27/2017 | 3:23:22 PM | $1.01 | 9,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:25:32 PM | 2,400 | $1.01 | 3/27/2017 | 3:23:22 PM | $1.01 | 9,000 |
| NINK Trader | SELL | 3/27/2017 | 3:25:32 PM | 2,400 | $1.01 | 3/27/2017 | 11:27:02 AM | $1.00 | 10,000 |
| NINK Trader | SELL | 3/27/2017 | 3:35:27 PM | 500 | $1.01 | 3/27/2017 | 11:27:02 AM | $1.00 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/27/2017 | 3:35:27 PM | 500 | $1.01 | 3/27/2017 | 3:23:22 PM | $1.01 | 9,000 |
| NINK Trader | SELL | 3/28/2017 | 3:11:38 PM | 5,250 | $1.10 | 3/27/2017 | 4:15:12 PM | $1.10 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/28/2017 | 3:11:39 PM | 5,250 | $1.10 | 3/28/2017 | 3:11:01 PM | $1.01 | 7,000 |
| NINK Trader | SELL | 3/29/2017 | 11:16:02 AM | 4,750 | $1.10 | 3/27/2017 | 4:15:12 PM | $1.10 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/29/2017 | 11:16:03 AM | 4,750 | $1.10 | 3/29/2017 | 11:15:37 AM | $1.01 | 6,000 |

A-5

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|------|------|------|----------------|--------------------|-----------------|------------|------------|-------------|----------------|
| NINK Trader | SELL | 3/30/2017 | 9:57:25 AM | 10,000 | $1.25 | 3/30/2017 | 8:35:57 AM | $1.25 | 10,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/30/2017 | 9:57:26 AM | 10,000 | $1.25 | 3/30/2017 | 9:56:55 AM | $1.25 | 12,500 |
| NINK Trader | SELL | 3/30/2017 | 10:45:08 AM | 1,000 | $1.35 | 3/30/2017 | 10:28:37 AM | $1.35 | 1,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/30/2017 | 10:45:08 AM | 1,000 | $1.35 | 3/30/2017 | 10:44:46 AM | $1.50 | 3,000 |
| NINK Trader | SELL | 3/30/2017 | 10:57:52 AM | 1,900 | $1.50 | 3/30/2017 | 10:53:05 AM | MKT | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 3/30/2017 | 10:57:52 AM | 1,900 | $1.50 | 3/30/2017 | 10:44:46 AM | $1.50 | 3,000 |
| NINK Trader | SELL | 4/4/2017 | 9:36:20 AM | 5,000 | $1.20 | 4/4/2017 | 9:25:00 AM | MKT | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 4/4/2017 | 9:36:20 AM | 5,000 | $1.20 | 4/4/2017 | 9:31:22 AM | $1.25 | 5,000 |
| NINK Trader | SELL | 4/4/2017 | 9:53:15 AM | 2,000 | $1.50 | 4/4/2017 | 9:39:43 AM | MKT | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 4/4/2017 | 9:53:15 AM | 2,000 | $1.50 | 4/4/2017 | 9:52:59 AM | $1.50 | 2,000 |
| NINK Trader | SELL | 4/4/2017 | 10:43:45 AM | 2,000 | $1.75 | 4/4/2017 | 9:39:43 AM | MKT | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 4/4/2017 | 10:43:45 AM | 2,000 | $1.75 | 4/4/2017 | 10:42:05 AM | $1.75 | 2,000 |
| NINK Trader | SELL | 5/15/2017 | 1:08:45 PM | 1,000 | $2.05 | 5/3/2017 | 11:14:13 AM | $2.05 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 5/15/2017 | 1:08:45 PM | 1,000 | $2.05 | 5/15/2017 | 1:08:26 PM | $2.05 | 1,000 |
| NINK Trader | SELL | 5/16/2017 | 11:05:31 AM | 2,700 | $2.05 | 5/3/2017 | 11:14:13 AM | $2.05 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 5/16/2017 | 11:05:31 AM | 2,700 | $2.05 | 5/16/2017 | 11:05:13 AM | $2.05 | 2,700 |
| William S. Lawler | SELL | 6/5/2017 | 9:31:54 AM | 500 | $2.00 | 6/5/2017 | 9:31:54 AM | $2.00 | 500 |
| Int'l Securities Holding Corp. / Lawler | BUY | 6/5/2017 | 9:31:54 AM | 500 | $2.00 | 6/4/2017 | 6:52:06 PM | $2.15 | 2,000 |

A-6

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|---|---|---|---|---|---|---|---|---|---|
| William S. Lawler | SELL | 6/5/2017 | 9:31:56 AM | 500 | $2.10 | 6/5/2017 | 9:31:56 AM | $2.10 | 500 |
| Int'l Securities Holding Corp. / Lawler | BUY | 6/5/2017 | 9:31:56 AM | 500 | $2.10 | 6/4/2017 | 6:53:06 PM | $2.15 | 2,000 |
| NINK Trader | SELL | 7/10/2017 | 3:12:02 PM | 900 | $2.19 | 5/26/2017 | 10:00:36 AM | $2.19 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 7/10/2017 | 3:12:02 PM | 900 | $2.19 | 7/10/2017 | 3:11:45 PM | $2.19 | 900 |
| NINK Trader | SELL | 7/11/2017 | 12:57:43 PM | 36 | $2.30 | 5/26/2017 | 10:00:36 AM | $2.19 | 5,000 |
| NINK Trader | SELL | 7/11/2017 | 12:57:43 PM | 1,964 | $2.30 | 7/11/2017 | 10:35:38 AM | $2.25 | 2,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 7/11/2017 | 12:57:43 PM | 2,000 | $2.30 | 7/11/2017 | 12:57:29 PM | $2.30 | 2,000 |
| NINK Trader | SELL | 8/1/2017 | 12:23:01 PM | 1,000 | $2.30 | 7/13/2017 | 9:51:40 AM | $2.30 | 3,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 8/1/2017 | 12:23:01 PM | 1,000 | $2.30 | 8/1/2017 | 12:22:36 PM | $2.30 | 1,000 |
| NINK Trader | SELL | 9/8/2017 | 2:35:10 PM | 3,200 | $2.35 | 9/5/2017 | 10:51:24 AM | $2.35 | 6098 |
| Int'l Securities Holding Corp. / Lawler | BUY | 9/8/2017 | 2:35:10 PM | 3,200 | $2.35 | 9/8/2017 | 2:34:36 PM | $2.35 | 3,800 |
| NINK Trader | SELL | 9/8/2017 | 3:15:45 PM | 545 | $2.35 | 9/5/2017 | 10:51:24 AM | $2.35 | 6098 |
| Int'l Securities Holding Corp. / Lawler | BUY | 9/8/2017 | 3:15:45 PM | 545 | $2.35 | 9/8/2017 | 3:15:27 AM | $2.35 | 600 |
| NINK Trader | SELL | 9/11/2017 | 12:08:41 PM | 3,000 | $2.40 | 9/11/2017 | 12:02:59 PM | $2.40 | 6,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 9/11/2017 | 12:08:41 PM | 3,000 | $2.40 | 9/11/2017 | 12:06:46 PM | $2.45 | 5,000 |
| NINK Trader | SELL | 9/18/2017 | 9:45:28 AM | 1,997 | $2.35 | 9/13/2017 | 9:29:28 AM | $2.35 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 9/18/2017 | 9:45:28 AM | 1,997 | $2.35 | 9/18/2017 | 9:45:06 AM | $2.35 | 2,000 |
| NINK Trader | SELL | 10/5/2017 | 3:27:30 PM | 500 | $2.35 | 9/17/2017 | 9:29:28 AM | $2.35 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 10/5/2017 | 3:27:30 PM | 500 | $2.35 | 10/5/2017 | 3:27:09 PM | $2.35 | 500 |

A-7

| Name | Type | Date | Execution Time | Execution Quantity | Execution Price | Order Date | Order Time | Order Price | Order Quantity |
|------|------|------|----------------|--------------------|-----------------| -----------|------------|-------------|----------------|
| NINK Trader | SELL | 10/5/2017 | 3:58:01 PM | 500 | $2.35 | 9/17/2017 | 9:29:28 AM | $2.35 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 10/5/2017 | 3:58:01 PM | 500 | $2.35 | 10/5/2017 | 3:57:49 PM | $2.35 | 500 |
| NINK Trader | SELL | 10/23/2017 | 9:48:13 AM | 500 | $2.35 | 10/23/2017 | 9:48:13 AM | $2.35 | 5,000 |
| Int'l Securities Holding Corp. / Lawler | BUY | 10/23/2017 | 9:48:13 AM | 500 | $2.35 | 10/23/2017 | 9:47:11 AM | $2.35 | 500 |

A-8